UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL BERGER, a/k/a "MAGIC
MIKE,"

        Plaintiff,

    v.

CITY OF SEATTLE, et al.,

        Defendants.

CASE NO. C03-3238JLR

ORDER

## I.  INTRODUCTION

This matter comes before the court on cross-motions for summary judgment.  (Dkt. ## 13, 37).  Neither party has requested oral argument, and the court finds oral argument unnecessary.  For the reasons stated below, the court GRANTS Plaintiff's motion in part, DENIES it in part, and DENIES Defendants' motion.

## II.  BACKGROUND

Plaintiff Michael Berger performs magic tricks, creates balloon animals, and offers other forms of entertainment as a street performer in Seattle.  Defendants own and administer Seattle Center, an 84-acre parcel of land that is home to museums, theaters, sports arenas, and other entertainment and cultural destinations, including the Space Needle, one of Seattle's most recognizable landmarks.  Since the City of Seattle (the "City") acquired the land in the late nineteenth century, Seattle Center has been open to the public.  Spread among the buildings are numerous plazas and parks where the public can congregate, subject to certain rules.

ORDER - 1

Those rules are the subject of the dispute between Mr. Berger and the Defendants. The Seattle Center Campus Rules ("the Rules") regulate activity at Seattle Center, ranging from a general curfew to traffic regulations to pet leash requirements.  In addition to sections regulating "speech activities" generally, the Rules contain a section aimed at street performers.  Plaintiff believes that these Rules violate his First Amendment rights. Plaintiff performs regularly at Seattle Center and contends that the Rules are unconstitutional on their face and as applied to him.

### III.  ANALYSIS

In examining these cross-motions, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial.  Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The opposing party must present significant and probative evidence to support its claim or defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  Where a question presented is purely legal, summary judgment is appropriate without deference to the non-moving party.

**A.      Seattle Center is a Traditional Public Forum.**

Although the First Amendment prohibits "abridging the freedom of speech," some abridgments pass constitutional muster.  To determine the constitutionality of a regulation that impacts speech, the court must first determine the nature of the forum in which the

ORDER - 2

regulation applies.  There are three categories:  the traditional public forum, the designated public forum, and the non-public forum.  Hopper v. City of Pasco, 241 F.3d 1067, 1074 (9th Cir. 2001).  The scrutiny a court applies to speech regulations is strictest in a traditional public forum and most deferential in a non-public forum.  Id.  Plaintiff contends that Seattle Center is a traditional public forum; Defendants contend that it is a "limited public forum," a subcategory within the designated public forum category.  See id.

Although there is no "clear-cut test" for a traditional public forum, courts must consider two principal factors among a "jumble" of others.  ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092, 1099-1100 (9th Cir. 2003).  The court must consider the "compatibility of the uses of the forum with expressive activity" as well as "speakers' reasonable expectations that their speech will be protected" in the forum.  Id. at 1100.

Despite the lack of a clear-cut test, it is clear to the court that the open areas at the Seattle Center are a traditional public forum.  The classic traditional public fora are "sidewalks, streets, and parks . . . ."  Id. at 1099; see also Grossman v. City of Portland, 33 F.3d 1200, 1204-05 (9th Cir. 1994) (reviewing historical and modern significance of parks as public fora).  The City argues that "Seattle Center is not a traditional public park" but rather "[g]overnment property whose primary purpose is ingress and egress . . . ."  Defs.' Mot. at 11-12.  City documents tell a different story.  The Rules themselves declare that Seattle Center is "the nation's best gathering place."  Rules at 1. The Seattle Center website declares the grounds "one of the nation's most extraordinary urban parks" and a "gathering place and public space open to everyone . . . ."  Garella Decl. ¶ 4 (citing *www.seattlecenter.com/information/default.asp*).  The City's map of

ORDER - 3

1
2

Seattle Center (Garella Decl., Ex. A) reveals that the Seattle Center is a collection of sidewalks, streets, and parks interspersed between a variety of attractions.[1]

3
4
5
6
7
8
9
10
11
12
13
14
15
16

In addition to the City's admission that the Seattle Center is a park, there is no evidence indicating that the Seattle Center is incompatible with expressive activity. Indeed, the City argues that the Rules are necessary because of the widespread expressive activity at Seattle Center.  As to the reasonable expectations of the public, Seattle Center's outdoor public areas are indistinguishable from city parks that are unquestionably limited public fora.  They are like the pedestrian mall found to be a public forum in ACLU of Nevada.  333 F.3d 1092, 1102 (noting that the "addition of entertainment" to the mall did not alter its character as a "public thoroughfare").  They are, as a matter of law, indistinguishable from portions of the Los Angeles park that the Ninth Circuit found to be a traditional public forum, despite the city's effort to designate those portions as a non-public forum.  Gerritsen v. City of Los Angeles, 994 F.2d 570, 576 (9th Cir. 1993).

17
18
19
20
21
22

The City bears the burden of demonstrating that the Seattle Center is not a traditional public forum.  Id. at 576.  It has not met that burden.  The City's attempt to label the campus a "place of ingress and egress"[2] is an effort to fit the Seattle Center into the same category as the Denver Performing Arts Plaza and Lincoln Center in New York City, two public spaces that courts have designated limited public fora.  Hawkins v.

23

24
25

_____

[1]The court's discussion throughout this order concerns Seattle Center's open outdoor areas.  Plaintiff does not contest any restrictions on speech in Seattle Center buildings.

26
27
28

[2]Even the evidence the City uses to support its claim that the Seattle Center is merely a place of ingress and egress emphasizes that it is a traditional public forum.  The City's claim that 85% of the Seattle Center's 10 million yearly visitors are there to attend a particular event reveals that at least 1.5 million people each year, more than 4000 people every day, are there for other purposes, presumably to congregate on the sidewalks and parks that are open to the public.

ORDER - 4

Denver, 170 F.3d 1281 (10th Cir. 1999); H.E.R.E. v. City of New York Dep't of Parks & Recreation, 311 F.3d 534 (2d Cir. 2002).  The fit is forced, to say the least.

The public spaces in Hawkins and H.E.R.E. are readily distinguishable from Seattle Center.  The Hawkins court considered the "Galleria," a 600 by 40 foot glass-covered walkway providing the sole means of ingress and egress for two large performing arts complexes.  170 F.3d at 1284.  Seattle Center's 84 acres, or more than 3.6 million square feet, are more than 150 times larger than the Galleria.[3]  Seattle Center claims more than 10 million visitors annually, or a daily average of over 27,000 visitors.  The 9300 arts patrons who could crowd the Galleria in Hawkins unquestionably created a more serious pedestrian "traffic" problem.  Id.  Most importantly, the Galleria was consistently subject to harsh restrictions on speech.  Id. at 1288 (describing the "absolute ban on leafleting and picketing" and noting that "Denver has neither in policy nor practice thrown open the Galleria for public expressive activity").  There is no evidence that Seattle Center has a similar historical pattern of repressing speech.  Indeed, the evidence shows that Seattle Center has consistently been open for public use, including expressive activity.  Garella Decl. ¶ 3.

The space at issue in H.E.R.E., a plaza at the entrance to the Lincoln Center, similarly provided ingress and egress for a performing arts center.  311 F.3d at 550.  Although there was no ban on expressive activity, the operators of the plaza historically restricted expressive activities to arts-related exhibitions consistent with the function of Lincoln Center.  Id. at 551.  There is no evidence that the City created the Seattle Center to provide access to its attractions.  There is also no evidence that the City has historically restricted speech activities at Seattle Center.  The Rules allow leafleting, signature

---

[3]Although buildings occupy some of Seattle Center's 84 acres, the vast disparity in size between Seattle Center and the Galleria is no less apparent.

ORDER - 5

gathering, demonstrations of fewer than 100 people, street performances, and picketing, demonstrating that the Seattle Center is open to a wide variety of expression.

Unlike the spaces in <u>Hawkins</u> and <u>H.E.R.E.</u>, Seattle Center is a traditional public forum.  The City's attempt to label it a "place of ingress and egress" is of no constitutional significance.  <u>See</u> <u>United States Postal Serv. v. Greenburgh Civic Assns.</u>, 453 U.S. 114, 133 (1981) (noting that the government cannot "by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums").

**B.      The Challenged Rules Are Not Valid Restrictions on the Time, Place, or Manner of Speech.**

Having established that Seattle Center is a traditional public forum, the court turns to the constitutionality of the Rules.  Plaintiff challenges five provisions on their face:

(1)      a requirement that street performers obtain a permit that the Seattle Center Director can revoke under numerous conditions (Rules F.1., F.2);

(2)      a requirement that street performers wear an identifying badge (Rule F.1.);

(3)      a requirement that all street performers confine their activities to one of sixteen "performance locations" (Rule F.5.);

(4)      a rule that allows street performers to engage in "passive solicitation" of money while banning "active solicitation" (Rule F.3.);

(5)      a generally applicable ban on all "speech activities" within 30 feet of any captive audience (Rule G.4.).[4]

---

[4]The court declines to reach Plaintiff's cursory challenge to the requirement that street performers abide by a rule banning the "treat[ment] of any person or animal in a manner that is aggressive, menacing, vulgar, profane, or abusive."   (Rules F.7, F.1.).  The challenge raises numerous questions, including whether this rule regulates conduct, as opposed to speech, and whether the rule is vague under either First or Fourteenth Amendment jurisprudence.  Plaintiff addresses none of these questions and cites no case authority.

ORDER - 6

1    The government can regulate speech in a traditional public forum as long as the

2    regulation meets the "time, place, or manner" test.  ACLU of Nev., 333 F.3d at 1106.  A

3    regulation on time, place, or manner must be (1) "justified without reference to the

4    content of the regulated speech," (2) "narrowly tailored to serve a significant

5    governmental interest," and must (3) "leave open ample alternative channels for

6    communication of the information."  Id. (citation omitted).  A "narrowly tailored"

7    regulation "targets and eliminates no more than the exact source of the 'evil' it seeks to

8    remedy."  Sabelko v. City of Phoenix, 120 F.3d 161, 165 (9th Cir. 1997) (citation

9    omitted).

10          The court finds that all of the challenged Rules satisfy the first prong of the time,

11   place, or manner test.  A rule is justified without reference to the content of the regulated

12   speech when it is "aimed to control secondary effects resulting from the protected

13   expression rather than at inhibiting the protected expression itself."  Tollis, Inc. v. San

14   Bernardino County, 827 F.2d 1329, 1332 (9th Cir. 1987) (internal quotation omitted).

15   The City has produced unchallenged evidence demonstrating that it enacted all of the

16   challenged provisions to target the secondary effects of street performers and other

17   speakers at Seattle Center.  Nellams Decl.; Douglas Decl.  The evidence shows that the

18   Rules aim to reduce chronic complaints from street performers about other street

19   performers monopolizing desirable performance locations, complaints from Seattle Center

20   tenants regarding street performers' noise levels and blocking access to buildings, and

21   complaints from Seattle Center visitors about pushy or overbearing street performers.

22   Nellams Decl.; Douglas Decl.  The general captive audience restriction targets visitors'

23   complaints about unwanted harangues and solicitations while waiting in line for Seattle

24   Center events.  Nellams Decl.  The undisputed evidence shows that the City did not adopt

25   the Rules "because of disagreement with the message that [street performers] convey."

ORDER - 7

<u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989).  While the Rules may have an "incidental effect" on street performers, they "serve[] purposes unrelated to content or expression . . . ."  <u>Id.</u>

As to the second and third prongs of the time, place, or manner test, the court must analyze each Rule separately.

**1.     The Street Performer Permit Requirement**

Rule F.1 requires street performers to obtain permits by filling out an application, paying a nominal administrative fee, and agreeing to abide by the Rules.  Although a permit is presumptively valid throughout the calendar year in which it was issued, the Seattle Center Director has "full discretion as to the term of the [p]ermit" and can revoke a permit if a performer violates the law, a Rule, or any term or condition of the permit. Rule F.2.  The Director can suspend permits "during activities or events that have been granted exclusive use rights to the campus . . . ."  <u>Id.</u>  The Director can also revoke permits "for convenience" with seven days' notice.

The street performer permit requirement is a form of prior restraint, and thus raises First Amendment warning flags.  <u>See</u> <u>Thomas v. Chicago Park Dist.</u>, 534 U.S. 316, 320-321 (2002); <u>Grossman</u>, 33 F.3d at 1204 (noting "heavy presumption" against validity of prior restraints).  Nonetheless, as long as a prior restraint is content neutral, a court analyzes it no differently than other time, place, or manner regulations.  <u>Thomas</u>, 534 U.S. at 322.  Plaintiff argues that because only street performers are subject to the permit requirement, it is necessarily content based.  The court disagrees.  Although the permit requirement applies only to street performers, it makes no distinction about the content of the street performance.  <u>See</u> <u>ACLU of Nev.</u>, 333 F.3d at 1106-07 (finding that a permit system targeting vendors was content neutral).  Singers, dancers, magicians, and mimes

receive the same treatment.  There are no indicia of content-based discrimination in the Rules.

Turning from the prior restraint issue to the remainder of the time, place, or manner test, the court finds that the permit requirement is unconstitutional because it is not narrowly tailored.  The permit requirement operates as a total ban on street performers who lack a permit.  Under the Rules, a "street performer" is anyone "who engages in any performing art or the playing of any musical instrument, singing or vocalizing, with or without musical accompaniment . . . ."  Rule C.15.  The reach of the ban is much like the invalid permit requirement in <u>Grossman</u>.  There, the challenged ordinance required a permit to "conduct or participate in any organized entertainment, demonstration, or public gathering, or to make any address" in a city park.  <u>Grossman</u>, 33 F.3d at 1204.  Much like the City here, Portland officials in <u>Grossman</u> justified the permit requirement out of concern for the "safety and convenience of park users."  <u>Id.</u> at 1206.

Critically, the Seattle Center permit requirement is like the one in <u>Grossman</u> because it sweeps too broadly.  <u>See id.</u>  The court accepts the City's evidence that some street performers have caused difficulty for Seattle Center patrons and tenants, but this is no justification for a ban on all street performance without a permit.  <u>See id.</u> (noting the need to protect "[s]pontaneous expression").  The City may have aimed the Rules at performers like Plaintiff, but their reach is much broader.  First Amendment jurisprudence compels the court to consider the range of speech that the Rules could reach, not merely what they were intended to reach.  <u>See id.</u>  Under the Rules, a latter-day Gene Kelly cannot sing in the rain at the Seattle Center.  No matter how persuasive the lyrical urgings of Martha Reeves and the Vandellas might be, there is no dancing in the street in the Seattle Center, at least not without permission.

ORDER - 9

Moreover, the permit requirement does not reach a wide range of speech activity that has a greater impact on Seattle Center patrons and tenants than street performers. Id. at 1206-07 (noting that "the City's stated interests and the burden that the park ordinance imposed on speech do not sufficiently match"). While one person cannot sing without a permit, 81 people wishing to congregate at Seattle Center to proclaim their political views (or any other expression that is not a "performance") can do so without concern. See Rule G.2; Grossman, 33 F.3d at 1207 (comparing impact of speech subject to permit rule to impact of activity not subject to the rule). Like the permit ordinance in Grossman, the Seattle Center street performer permit requirement is not "narrowly tailored to protect speech, as it should [be]," but is rather "tailored so as to preclude speech." Id. It sweeps too broadly by barring spontaneous, low-impact "performances," while permitting gatherings of as many as 99 people to speak their minds so long as they do not engage in a "performing art." The permit requirement restricts speech that does "not impede [the City's] permissible goals" of regulating the multiple uses of the Seattle Center. Id. (citation omitted). The requirement is not narrowly tailored, and is thus unconstitutional.

### 2.    The Identification Badge Requirement

Because the court finds the street performer permit requirement unconstitutional, the court need not address the requirement that permits "shall be evidenced by a badge that shall be worn or displayed by the performer . . . ." Rule F.1.

### 3.    The Performance Location Restriction

The City's failure to narrowly tailor its restriction on where street performances can occur is also fatal to its constitutionality. Rule F.5 restricts street performers to areas of Seattle Center designated in the the street performer permit application. As with the permit requirement, the court accepts that the Rule is designed to confine street

1    performers to certain areas to mitigate their adverse impact on Seattle Center patrons.  As

2    with the permit requirement, the City presents no justification for these restrictions in

3    light of the freedom of groups of up to 99 people who are not street performers to

4    congregate wherever they please.

5        **4.    The "Active Solicitation" Ban**

6        The Rules permit performers to solicit donations "passively."  Rule F.3.a.  Passive

7    methods include an instrument case or other receptacle, along with a sign requesting

8    donations.  Id.  Performers may not, however, "actively solicit donations, for example by

9    live or recorded word of mouth, gesture, mechanical devices, or second parties."  Id.

10       The First Amendment protects solicitation for money.  Schaumburg v. Citizens for

11   a Better Env't, 444 U.S. 620, 633 (1980).  The Ninth Circuit has struck down bans that

12   target particular groups of solicitors in traditional public fora.  E.g., Perry v. Los Angeles

13   Police Dep't, 121 F.3d 1365, 1371 (9th Cir. 1997) (striking down ban on all solicitation

14   other than from nonprofit groups).  Bans targeting means of solicitation have met with

15   mixed results.  Project 80's, Inc. v. City of Pocatello, 942 F.2d 635, 639 (9th Cir. 1991)

16   (striking down ban on door-to-door solicitation); ACORN v. City of Phoenix, 798 F.2d

17   1260, 1273 (9th Cir. 1986) (upholding ban on solicitation from vehicles in traffic).

18       As with the permit requirement, the court finds that the active solicitation ban is

19   not narrowly tailored.[5]  The difference between the adverse effects of solicitation that the

20   city has targeted (i.e. the interest in protecting patrons from unwanted solicitation) and the

21   sweep of the solicitation ban is striking.  While a street performer cannot offer a meek

22   oral request for a donation from passers by, a beggar who does not perform can solicit

23   Seattle Center visitors with relative impunity, subject only to general criminal

---

[5]Because the Ninth Circuit has not addressed a ban like the City's, only the general time, place, or manner test guides the court.  See ACLU of Nev., 333 F.3d at 1108.

ORDER - 11

prohibitions on aggressive panhandling.  Even more so than with the Rules' permit requirement, the mismatch between the solicitation ban's aim and its reach is fatal to its constitutionality.[6]

### 5.     The Captive Audience Restriction

The Rules also generally bar "speech activities" within 30 feet of captive audiences.  Rule G.4.  "Speech activities" include "political speech and commercial speech" but not "activity conducted by City employees or licensed concessionaires." Rule C.14.  A "captive audience" is any person or group waiting in line to attend a Seattle Center event or purchase tickets, goods, or services; attending a Seattle Center event; or eating in a designated location.  Rule C.5.

Courts have recognized a limited right to regulate speech directed at a "captive audience [that] cannot avoid the objectionable speech." Frisby v. Schultz, 487 U.S. 474, 487 (1988) (internal quotations omitted).  The rationale behind that right has less force, however, when applied in a traditional public forum.  See Lehman v. Shaker Heights, 418 U.S. 298, 302-03 (1974); see also Frisby, 487 U.S. at 484 ("[I]n many locations, we expect individuals simply to avoid speech they do not want to hear.").

No court has recognized the desire to protect captive audiences in a traditional public forum as a significant government interest.  The Supreme Court has declined to reach the issue.  Heffron v. Int'l Soc. for Krishna Consciousness, 452 U.S. 640, 650 n.13 (1981).  The Ninth Circuit has flatly dismissed the notion.  Kuba v. 1-A Agric. Ass'n, 387 F.3d 850, 861 n.10 (9th Cir. 2004) (rejecting as "unpersuasive" the interest in protecting a captive audience outside a "place of public entertainment").  On the other hand, the

---

[6]The City might be able to implement an active solicitation ban that passes constitutional muster.  E.g., Doucette v. City of Santa Monica, 955 F. Supp. 1192, 1209 (C.D. Cal. 1997).  It cannot, however, apply the ban solely to street performers absent a stronger evidentiary showing.

ORDER - 12

Supreme Court has recognized that captive audience restrictions can be appropriate where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." Erznoznik v. Jacksonville, 422 U.S. 205, 209 (1975).

The court need not decide if a narrowly drawn captive audience restriction in a traditional public forum might advance a significant government interest, as the City has failed to narrowly tailor the restriction at issue here. In this instance, the problem lies in the City's unexplained decision to bar all speakers within 30 feet of captive audiences *except* City officials or licensed concessionaires. The City offers no evidence that Seattle Center's captive audiences have any more interest in hearing unwanted speech from City-approved speakers than those it does not approve. Absent such evidence, the City's ban is not narrowly tailored to advance its interest in protecting captive audiences.

## IV.  CONCLUSION

The court's decision is neither dispositive of this action nor dispositive of every issue raised in the pending motions. The court does not reach the remaining issues for two reasons. First, the parties have indicated that the court's resolution of Plaintiff's facial constitutional challenges may permit the parties to reach a settlement of this action at their April 28 settlement conference. Second, the minimal attention the parties pay to many of the remaining issues (including Plaintiff's "as-applied" challenge to the Rules, Plaintiff's claim for damages, Defendants' qualified immunity defense, and Plaintiff's claim under a Washington public disclosure statute) prevents the court from ruling on them.

The court thus GRANTS Plaintiff's motion for summary judgment (Dkt. # 13) solely as to his facial constitutional challenges, and DENIES it in all other respects. The court DENIES Defendants' cross-motion for summary judgment. (Dkt. # 37). As the Defendants have indicated that the court's resolution of the constitutional issues may

ORDER - 13

1
2
3
4
5
6
7

allow them to resolve the disputes raised in Defendants' motion for discovery sanctions (Dkt. # 34), the court directs the clerk to RENOTE that motion for April 29, 2005.  The court will address that motion as well as the remaining issues at the pretrial conference scheduled for April 29, 2005.  The court directs the clerk to reset the time for the pretrial conference from 3:00 p.m. to 1:30 p.m.  The court orders Plaintiff to personally appear at the pretrial conference, along with all counsel of record.

8

Dated this 22nd day of April, 2005.

9
10
11
12

JAMES L. ROBART
United States District Judge

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORDER - 14